IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

ELINA ZAYCHICK                                    CASE NO.:  9:15-cv-80336-RLR

    Plaintiff,

vs.

BANK of AMERICA, N.A.,

    Defendants.

_____/

## AMENDED COMPLAINT FOR DAMAGES

Plaintiff Elina Zaychick by and through undersigned counsel, sues Defendants Bank of America, N.A.  Plaintiff's claims arise under the recently amended provisions of the Real Estate Settlement Procedures Act (12 U.S.C. § 2605, also known as "RESPA") and its implementing Regulation X.  The specific provisions of Regulation X relevant to this case are found at 12 C.F.R. §1024.41 and 12 C.F.R. §1024.36.  As we explain below, the recent amendments to 12 U.S.C. § 2605, and 12. C.F.R. §1024.41, provide borrowers facing a mortgage foreclosure with the substantive and legally enforceable rights relating to foreclosure alternatives referred to as "loss mitigation."  Here, Bank of America has made inconsistent and confusing representations concerning whether it complied with its affirmative obligation to consider Borrower for the Home Affordable Modification Program offered by the United States Treasure.  Thus, due to the confusion and ambiguity arising from Bank of America's inconsistent representations,  Borrower pleads two different RESPA theories in the alternative arising from Bank of America's violation of 12 C.F.R. §1024.41.  In addition, Borrower asserts that Bank of America separately and independently violated 12 C.F.R. §1024.36, and seeks relief on that basis as well.

## THE PARTIES, JURISIDICTION, AND VENUE

1. Plaintiff Elina Zaychick is a natural persons over the age of 21. She is a citizen of the State of Florida and resides in Palm Beach County, Florida. Plaintiff will be referred to hereafter as "Borrower."

2. Defendant Bank of America, N.A. is a Delaware Corporation with its principal place of business in the State of North Carolina. It engages in substantial business activities throughout the State of Florida, including the territorial jurisdiction of this Court and is therefore subject to its jurisdiction. Bank of America's business activities within the territorial jurisdiction of this Court include, but are not limited to, servicing a large number of federally related residential mortgage loans secured by real property located within the territorial jurisdiction of this Court. This Defendant will be referred to hereafter as "Bank of America."

3. In this action, Plaintiff pursues a cause of action under the RESPA. Thus, this case presents a federal question giving this Court subject matter jurisdiction over that claim under 28 U.S.C. § 1331.

4. All the acts and omissions that give rise to this lawsuit either occurred in Palm Beach County, Florida or relate to real property located in Palm Beach County, Florida. Accordingly, venue is proper in this Court.

## GENERAL ALLEGATIONS

5. Borrower owned a home located in Boca Raton, Florida. This home was subject to a first mortgage lien that was created as a result of a transaction between Pinnacle Direct Funding Corporation, Inc. and Borrower that was consummated on the 23rd day of June, 2006.

6. As a mortgage servicer, Bank of America is engaged in handling accounting, customer service, collection, and virtually all other services related to managing the residential

mortgage loans in its portfolio. For all practical purposes, Bank of America and other mortgage servicers generally appear to the borrowers whose loan they service as the mortgagee or "lender." However, this appearance is not reality. In fact, there is no debtor/creditor, or even any contractual relationship, between Plaintiff and Bank of America.

7. In its final rule and official interpretations implementing the recently amended version of Regulation X, the Consumer Financial Protection Bureau describes the mortgage servicing industry as follows:[1]

> Mortgage servicing is performed by banks, thrifts, credit unions, and non-banks under a variety of business models. In some cases, creditors service mortgage loans that they originate or purchase and hold in portfolio. Other creditors sell the ownership of the underlying mortgage loan, but retain the mortgage servicing rights in order to retain the relationship with the borrower, as well as the servicing fee and other ancillary income.
>
> In still other cases, servicers have no role at all in origination or loan ownership, but rather purchase mortgage servicing rights on securitized loans or are hired to service a portfolio lender's loans. These different servicing structures can create difficulties for borrowers if a servicer makes mistakes, fails to invest sufficient resources in its servicing operations, or avoids opportunities to work with borrowers for the mutual benefit of both borrowers and owners or assignees of mortgage loans.
>
> ***
>
> Contracts between the servicer and the mortgage loan owner specify the rights and responsibilities of each party . . . servicer contracts govern servicer requirements to advance payments to owners of mortgage loans, and to recoup advances made by servicers, including from ultimate recoveries on liquidated properties.

---

[1] The text of this paragraph, as well as paragraphs, is quoted from the Final Rule and Official Interpretations promulgated by the Consumer Financial Protection Bureau, pages 14-17. Available at http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa.pdf (Last visted on August 1st, 2015).

>Compensation structures vary somewhat for loans held in portfolio and securitized loans, but have tended to make pure mortgage servicing (where the servicer has no role in origination) a high-volume, low-margin business. Such compensation structures incentivize servicers to ensure that investment in operations closely tracks servicer expectations of delinquent accounts, and an increase in the number of delinquent accounts a servicer must service beyond that projected by the servicer strains available servicer resources. A servicer will expect to recoup its investment in purchasing mortgage servicing rights and earn a profit primarily through a net servicing fee (which is typically expressed as a constant rate assessed on unpaid mortgage balances), interest float on payment accounts between receipt and disbursement, and cross-marketing other products and servicers to borrowers. Under this business model, servicers act primarily as payment collectors and processors, and will have limited incentives to provide other customer service. Servicers greatly vary in the extent to which they invest in customer service infrastructure. For example, servicer staffing rations have varied between approximately 100 loans per full-time employee to over 4,000 loans per full time employee. Servicers are generally not subject to market discipline from consumers because consumers have little opportunity to switch servicers. Rather, servicers compete to obtain business from the owners of loans—investors, assignees, and creditors—and thus competitive pressures tend to drive servicers to lower the price of servicing and scale their investment in providing service to customers accordingly.

8. Borrower fell behind on their mortgage payments, which ultimately led Bank of America's principal (the mortgagee/investor) to file a foreclosure lawsuit against her in the 15th Judicial Circuit in and for the State of Florida on or about March 1st, 2012. The foreclosure action was filed on behalf of the Deutsche Bank National Trust Company as Trustee. However, the attorney that prosecuted that action was retained by Bank of America and reported to Bank of America. A final judgment was entered in favor of the foreclosure action plaintiff, and the property was sold on October 3rd, 2014. However, the eviction process has not yet concluded, and Borrower still occupies the property.

## CLAIM FOR RELIEF– VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT (AGAINST BANK OF AMERICA)

9. Plaintiff re-alleges and incorporates by reference her allegations in Paragraphs 1 through 8 above.

10. This is an action for actual damages, statutory damages, attorney's fees and litigation costs brought pursuant to The Real Estate Settlement Procedures Act (hereafter RESPA)(12 U.S.C. 2605(f)).

11. Regulation X (12 C.F.R § 1024), implements the Real Estate Settlement Procedures Act (RESPA).  RESPA was amended by the 2010 Dodd/Frank Wall Street Reform and Consumer Protection Act, and those amendments became effective on January 10th, 2014, when the Consumer Financial Protection Bureau's implementing amendments to Regulation X took effect. The amended version of Regulation X imposes specific substantive obligations upon mortgage servicers relating to processing applications for loss mitigation (alternatives to foreclosure) and responding to borrower requests for information.

12. Although Borrower asserts a single cause of action under RESPA, Bank of America violated RESPA in three different ways, two of which are alleged in the alternative in this case.  (1). Bank of America failed to comply with its obligation under 12. C.F.R. §1024.41(c)(i) to evaluate Borrower for all loss mitigation options available because it neglected to consider her for a common foreclosure alternative program offered by the Department of the Treasury known as "Home Affordable Modification Program" or "HAMP."  (2)  In the alternative, Bank of America failed to provide Borrower with a sufficiently specific explanation

for its denial of Borrower's loss mitigation application as required by 12 C.F.R. §1024.41(d)[2]; and (3) Bank of America separately and independently failed to comply with its obligations under 12 U.S.C. § 2605(e) and 12 C.F.R. § 1024.36 in response to Borrower's Request for Information.

## BANK OF AMERICA FAILS TO CONSIDER BORROWER FOR ALL AVAILABLE LOSS MITIGATION OPTIONS

13.   After the January 10th, 2014 implementation of the RESPA amendments, Plaintiff submitted a loss mitigation application to Bank of America.

14.   By letter dated May 9th, 2014, Bank of America advised that Borrower's loss mitigation application had been denied. A true and correct copy of that letter is attached hereto as Exhibit "A."

15.   The denial letter attached hereto as Exhibit "A" is a form letter. It states **"[y]ou do not meet the eligibility requirements for the following loan modification program(s)."** (emphasis in the original). The drafting of this document demonstrates that it is intended to be sent to a large number of borrowers, and designed to apply in various different situations. Since the letter refers to "loan modification program(s)", it recognizes that there are more than one possible loan modification program that a borrower could be considered for. However, the letter that Borrower received refers to only one program nebulously described as "Investor-Approved Loan Modification Program (non-delegated program)." This letter does not identify any other program, or suggest that any other program was considered.

---

[2] 12 C.F.R. §1024.41(a) specifies that the loss mitigation procedures it establishes are privately enforceable under 12 U.S.C. § 2605(f).

16. Notably, the United States Treasury administers a very well-known loss mitigation program known as the "Home Affordable Modification Program" also known as "HAMP." The majority of mortgage investors participate in HAMP.

17. Regulation X, 12 C.F.R. §1024.41(d), obligates the service to provide the "…the specific reason or reasons for the servicer's determination for each such trial or permanent loan modification option and, if applicable, that the borrower was not evaluated on other criteria."

18. On May 17th, 2014, only 8 days after sending the denial letter, Bank of America sent Borrower an inconsistent letter with related enclosures inviting Borrower to apply for a loan modification. The letter affirmatively stated that Borrower would be considered for the HAMP program.[3] The enclosures that Bank of America sent include a "Request for Mortgage Assistance" which includes the "Making Home Affordable Program" logo and the "www.Makinghomeaffodable.gov internet site." A true and correct copy of this correspondence and supporting attachments is attached hereto as Exhibit "B."

19. Borrower therefore believed that Bank of America was still willing to consider her for a HAMP modification. Accordingly, promptly filed out the application and sent Bank of America the requested supporting documentation.

20. In order to maximize the likelihood that she would receive a HAMP modification, Borrower continued to employ and pay a law firm known as "Litigation Law" to assist her with her loss mitigation application and represent her in the foreclosure lawsuit, even though she had entered into a stipulation for a consent judgment. Importantly however, the stipulation noted that there was a pending loss mitigation application, and contemplated that the sale would not take place for 150 days, thereby allowing ample time to complete the loss mitigation review process.

---

[3] See last question on first page of Frequently Asked Questions found on page 15 of Exhibit "B."

21. After the May 17th correspondence (and therefore after the May 9th denial letter) Bank of America repeatedly requested documentation supporting Borrower's loss mitigation application. Borrower promptly complied each time. Borrower continued to employ Litigation Law, in large part to assist her with the loss mitigation process and in complying with Bank of America's related requests.

22. On October 22nd, 2014, an attorney associated with Litigation Law and representing Borrower appeared at hearing before the state court asking that the sale be cancelled because Borrower's loss mitigation application was pending. Counsel for the foreclosure Plaintiff (who was retained by Bank of America and who reported to Bank of America) opposed that request and represented that Borrower's application had been denied during the month of May.

23. Borrower has never received any correspondence advising her of any decision regarding her application for a HAMP modification.

24. The recently amended loss mitigation provisions of Regulation X found at 12 C.F.R. §1024.41(c)(i) provide that where, as here, the servicer receives a completed loss mitigation application at least 37 days before a foreclosure sale, the servicer must evaluate the borrower for all loss mitigation applications available.

25. Bank of America's denial letter attached hereto as Exhibit "A" makes no reference to the HAMP program. Furthermore, shortly after it sent her that denial letter, Bank of America invited Borrower to apply for a HAMP modification, but never advised her of any decision specifically related to HAMP. Instead, months after inviting her to apply for a HAMP modification, the attorney that Bank of America retained to prosecute the mortgage foreclosure opposed Borrower's request that the foreclosure sale be rescheduled due to Borrower's then

pending request for a HAMP.  Bank of America's failure to reference HAMP in the denial letter, its subsequent invitation to Borrower to apply for a HAMP modification, and efforts to bring the foreclosure litigation to a conclusion without ever advising Borrower of any determination of the HAMP application, give rise to the reasonable inference that Bank of America never considered Borrower's HAMP application.  This failure is a violation of Bank of America's obligation under 12. C.F.R. §1024.41(c)(i) to consider Borrower for all available loss mitigation options.

26. Bank of America's failure to consider Borrower for a HAMP modification has caused borrower to sustain damages.  If Borrower were qualified for a HAMP modification, Borrower would have avoided the emotional distress associated with losing her home, as well as the costs of relocation.  Alternatively, even if she would not have qualified for a HAMP modification, Borrower went to substantial effort, and incurred expense including but not limited to expenses associated with professional assistance with her HAMP application, in order to be considered for a HAMP modification.  As a result of Bank of America's failure to consider her for the HAMP program,  Borrower's efforts and expenditures relating to her HAMP application were wasted.

### BANK OF AMERICA'S FAILURE TO  PROVIDE A WRITTEN DENIAL LETTER THAT COMPLIES WITH  12 C.F.R. §1024.41(d)

27. In the alternative, Borrower alleges that if Bank of America did in fact consider her for the HAMP program, the lack of specificity contained in its May 9th, 2014 denial letter attached hereto as Exhibit "A"  violates 12 C.F.R. §1024.41(d) and caused her damage. If Borrower had known that her HAMP application had been denied, she would not have incurred the expenses (including to expenses associated with professional assistance in obtaining a loan modification) associated with making a second application in response to the inconsistent May

17th, 2015 correspondence attached hereto as Exhibit "B."   Furthermore, Bank of America's omission exacerbated the emotional distress associated with the on-going foreclosure by prolonging the process and causing increased confusion, uncertainty, anxiety and frustrated associated with her ultimately fruitless pursuit of a HAMP modification in response to the May 17th, 2014 correspondence.

28. 12 C.F.R. §1024.41(d) requires a mortgage servicer to provide each borrower with a specific reason whenever it denies a loss mitigation application.  Here, Bank of America has chosen to us a form letter so vague that it refers to generically to "….the following loan modification program(s)."  This use of this ambiguous form letter elevates form over substance and fails to provide any specific information to the borrower who receives it.  Bank of America's use of that form letter is incompatible with its obligation under 12 C.F.R. §1024.41(d), because that section entitles each borrower to a specific explanation for any denial.  Furthermore, because this form letter was sent to many different borrowers,  Bank of America's use of that form letter represents a pattern and practice of non-compliance with 12 U.S.C. § 2605 and  12 C.F.R. §1024.41(d).

### BANK OF AMERICA'S FAILURE TO PROVIDE INFORMATION IN RESPONSE TO BORROWER'S FORMAL REQUEST FOR INFORMATION

29. By letter dated November 3rd, 2014, an attorney representing Borrower sent a letter to Bank of America, specifically invoking the recently amended provisions of RESPA and Regulation X, requesting specific information.  A true and correct copy of that letter is attached hereto as Exhibit "C."  Request Number 6 seeks information about "all loss mitigation options that the owner/investor/holder is participating in."

30. Bank of America responded by two separate letters. However, neither letter provides any information responsive to the specific request about the owner/investor/holder's loss mitigation alternatives. True and correct copies are Bank of America's responses are attached hereto as Exhibits "D" and "E" respectively.

31. Bank of America's failure to provide Borrower with the information that she requested under 12 C.F.R § 1024.36, has caused her to sustain actual damages, including but not limited to the costs associated with preparing and sending her Request for Information, and emotional distress.

32. Bank of America's failure to appropriately respond to her Request for Information is part of a pattern and practice whereby Bank of America routinely neglects borrower concerns. Since the 2010 Dodd/Frank Amendments were implemented on January 10th, the undersigned has assisted five different borrowers who sent correspondence to Bank of America invoking 12 U.S.C. § 2605(e)1(b). [4]

33. Rose Mary Wise sent Bank of America a Notice of Error in September of 2014 alerting it to the fact that it had wrongfully placed force-placed insurance on a property that had been completely demolished. Although Bank of America responded to that letter, its response was non-responsive and did not fairly meet the substance of the concerns she articulated. Partially as a result of that omission, Ms. Wise filed a lawsuit in this Court that was litigated under Case Number 14-cv-61752.

---

[4] 12 U.S.C. 2605(e)1(b) obligates a mortgage servicer to respond to "Qualified Written Requests" from borrowers. 12 C.F.R. 1024.35(a) defines a "notice of error" as a type of Qualified Written Request. 12 C.F.R §1024.36 describes an "information request" as another type of "Qualified Written Request"  12 U.S.C. 2605(f)(1)(B) authorizes the recovery of statutory damages where there is a pattern and practice of servicing non-compliance with "this section." Thus, a pattern and practice of non-compliance can be established by repeated failures to appropriately respond to either "notices of error" or "information requests"

34. Also in September of 2014, Bank of America borrower Charlotte Jalieba sent a Notice of Error to Bank of America alerting it to the fact that it erroneously believed that her home was vacant. As a result, Bank of America sent contractors to her home who repeatedly broke into the property and changed the locks, thereby denying her access to her home. Based on its erroneous belief that the property was vacant, Bank of America charged Ms. Jalieba exorbitant fees for maintaining the lawn. Bank of America also contacted Ms. Jalieba's insurance company and told them that the property was vacant, prompting the insurance company to cancel Ms. Jalieba's insurance coverage, resulting in Bank of America procuring vastly more expensive force-placed insurance at Ms. Jalieba's expense. Bank of America failed to respond to Ms. Jalieba's letter until long after the 30 business day deadline under RESPA had passed, and even then expressly refused to reverse the property maintenance charges, and expressly refused to address the other concerns Ms. Jalieba raised in her Qualified Written Request asserting that these concerns "…do not require a substantive response."

35. In October of 2014, Bank of America borrower Alourde Destine sent a Notice of Error and Request for Information after Bank of America sent a confusing perplexing letter in 2014 indicating that it was adjusting her mortgage payment based on transactions that purportedly happened in 2012. Bank of America's only response was to inexplicably assert that Ms. Destine is "not currently a Bank of America customer."

36. Yvanne Pierre Noel is another homeowner who owned a property that Bank of America claimed had a mortgage serviced Bank of America. In 2005, Ms. Pierre Noel obtained a judgment quieting title and extinguishing Bank of America's claimed mortgage, after she demonstrated that someone else had fraudulently obtained the mortgage on her property and without her authorization. Nevertheless, ten years later in 2015 Bank of America filed a

mortgage foreclosure lawsuit against her.  In March of 2015 Ms. Pierre Noel sent Bank of America a Notice of Error regarding its impermissible foreclosure, but Bank of America refused to respond insisted that since she was not the borrower, it would only respond if the party that fraudulently obtained the mortgage authorized her to communicate with Bank of America.

37. In short, the undersigned is familiar with six different instances, including the present case, when a Bank of America borrower attempted to send a Qualified Written Request to Bank of America.  In all six instances,  Bank of America failed to substantively respond to that request.  This demonstrates Bank of America's callous disregard of its obligations under 12 U.S.C. § 2605(e)1(b),and  pattern and practice of non-compliance justifying an award of statutory damages.

38. Plaintiff has retained undersigned counsel to represent her in this action and is entitled to an award of prevailing party attorney's fees pursuant to the attorney fee shifting provisions of RESPA found at 12 U.S.C. § 2605(f)(3).

WHEREFORE, Plaintiff demands trial by jury and respectfully requests that this Honorable Court enter judgment in the entire amount of her damages as determined at trial.

*(Continued on Next Page)*

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands trial by jury on all claims so triable.

                        Respectfully submitted,

                        THE LAW OFFICES OF JEFFREY N. GOLANT, P.A
                        1999 N. UNIVERSTIY DRIVE. STE. 213
                        POMPANO BEACH, FL 33071
                        Phone:  (954) 942-5270
                        Fax: (954) 942-5272
                        Email:  jgolant@jeffreygolantlaw.com
                        By: **/S/ JEFFREY N. GOLANT ESQ.**
                        Fla. Bar. No. 0707732
                        Co-Counsel for Plaintiff Elina Zaychick

                        Jessica L. Kerr, Esq.
                        Jessica L. Kerr, P.A. 401 E Las Olas Blvd Ste 130
                        Fort Lauderdale, FL 33301-2477
                        Fla Bar. No.  92810
                        Email: jessicakerresquire@gmail.com
                        Co-counsel for Plaintiffs Maria Mantilla and John Lage

## CERTIFICATE OF SERVICE

I hereby certify that on August 4th, 2015 I electronically filed the foregoing document with the Clerk of Court using CM/ECF and I also certify that the foregoing document is being served this day on all counsel of record in the manner specified via transmission of Notices of Electronic Filing generated by CM/ECF.

Service List:

Arliel Acevedo Esq.
LIEBLER, GONZALEZ &PORTUONDO
Courthouse Tower - 25th Floor
44 West Flagler Street
Miami, FL 33130
Telephone: (305) 379-0400
Fax: (305) 379-9626
Florida Bar No. 946001
E-mail: aa@lgplaw.com
Attorney for Defendant Bank of America

　　　　　　　　　　　　　　　　　　　　　　　　　　**/S/ Jeffrey Golant**